UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JAMES AND MELISSA ZEBROWSKI, | : | |
| Plaintiffs, | : | |
| | : | Civil No. 1:07-cv-05236 (JHR) |
| v. | : | |
| | : | **MEMORANDUM OPINION** |
| WELLS FARGO BANK, N.A., AS SUCCESSOR IN INTEREST TO WELLS FARGO HOME MORTGAGE, | : | **& ORDER** |
| Defendant. | : | |

This matter comes before the Court on a Motion for Summary Judgment [Dock. Entry No. 43] filed by Defendant Wells Fargo Bank, N.A. Plaintiffs James and Melissa Zebrowski commenced this action for damages allegedly incurred from Defendant's inaccurate mortgage services. They have opposed the motion for summary judgment as to Count IV ("Negligence"), Count X (violation of the New Jersey Consumer Fraud Act), and Count XI[1] (violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) of the Amended Complaint [Dock. Entry No. 17]. The Court previously dismissed Counts VI ("Abuse of Process"), VII ("Violation of Civil Rights"), VIII ("Use of Process"), and IX ("Frivolous Action") pursuant to Federal Rule of Civil Procedure 12(c) [Dock. Entry Nos. 34, 35]. As part of the briefing of the instant motion [Dock. Entry No. 52], Plaintiffs have withdrawn Count I (violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681), Count II ("Fraud"), and Count III (Breach of Contract"). While Plaintiffs did not expressly concede summary judgment on Count V ("Breach of Covenant of Good Faith and Fair Dealing"), their opposition brief did not discuss that cause of action.

---

[1] Plaintiffs incorrectly number the eleventh count as "Count II." (See Am. Compl. ¶¶ 92-95.)

## I. Jurisdiction

Jurisdiction over this civil action is premised on the existence of a federal question.  See 28 U.S.C. § 1331.  Federal question jurisdiction exists in "all civil actions arising under the Constitution, laws, or treaties of the United States."  Id.  The Court has supplemental jurisdiction over the remaining state-law claims.  See 28 U.S.C. § 1367(a).

## II. Factual Background

Plaintiff James Zebrowski procured a mortgage and note from Defendant on December 13, 2002.  The loan documents prescribed that Defendant would pay Plaintiffs' real estate taxes from an escrow account.  Under the terms of the loan, Mr. Zebrowski was required to make monthly payments of principal and interest totaling $1,307.07 until February 2010.  He was also initially responsible for making monthly escrow payments to fund property taxes and insurance.

Plaintiffs allege that  Defendant failed to timely pay the taxes in 2003 and 2005. (Am. Compl. ¶ 11.)  As a result, Plaintiffs received delinquency notices, were charged late fees, and were forced to pay a sum to avoid a threatened tax sale of their property.  (Id. ¶¶ 12-13.)

Upon Plaintiffs' request, on April 5, 2005, Defendant granted Mr. Zebrowski an escrow deletion so that Plaintiffs could pay their own taxes.  They subsequently failed to pay the property taxes due October 2005 and January 2006.  On or about January 10, 2006, Defendant was notified by the relevant taxing authority of the missed payments, and sent a letter to Plaintiffs notifying them of the property tax arrears.  The letter asked Plaintiffs to provide Defendant with proof of payment of the delinquent taxes.  The letter further noted:

> If you have not made this tax payment, we can assist you by paying the full amount of the past due taxes, including all applicable interest/penalty due. An escrow account will be established on your behalf for the collection of the advance, as well as all future tax bills. Your monthly mortgage payment will increase to repay the advance and to collect for a monthly escrow deposit.

At his deposition, Mr. Zebrowski stated that mail service at his home was uninterrupted during 2006. A second letter notifying Plaintiffs of the property tax arrears, requesting proof of payment, and noting that an escrow account would be created was sent on February 16, 2006. Plaintiffs failed to respond to either letter, and never sent proof of payment of the property tax arrears.

As a result of Plaintiffs' failure to pay their property taxes or even respond to Defendant's correspondence, on March 13, 2006, Defendant paid taxes due October 2005 ($1,868.00), January 2006 ($1,728.90), and April 2006 ($1,728.89), as well as interest and penalties of $129.47. That same day, Defendant notified Plaintiffs in a third letter that an escrow account had been reestablished to pay for delinquent and future taxes. The letter specifically noted:

> An escrow account has been established on your behalf for the collection of the amount advanced to bring your taxes current, as well as to pay all future tax bills for the life of this loan. Your monthly mortgage payment will increase to repay the advance and to establish the escrow account.

Defendant also sent Plaintiffs an Escrow Disclosure Statement and Notice of New Mortgage Payment on March 15, 2006. The Disclosure Statement notes that mortgage payments would increase to $2,472.66 beginning May 1, 2006, to cover $1,307.07 in principal and interest, $599.48 in escrow, and $566.11 in prorated escrow shortage.

Upon receipt of the new payment information, Mr. Zebrowski placed a telephone

3

call to Defendant on March 17, 2006, and claimed that the escrow account had been erroneously created because he paid the property taxes due October 2005 and January 2006, and that he had cancelled checks evidencing payment. Plaintiffs have since admitted that these contentions were false because, in fact, Plaintiffs did not pay the taxes due October 2005, January 2006, or April 2006. Mr. Zebrowski repeated this false statement on a number of subsequent calls, including calls on April 10, 2006, May 16, 2006, and May 24, 2006, and thereafter. During the March 17th phone call, Mr. Zebrowski also advised Defendant that he would be late in making his payment for March 2006, promising to pay it in early April 2006.

     Principal and interest payments due March and April 2006 were received and applied by Defendant on April 11, 2006. Defendant waived the applicable late fees in light of Mr. Zebrowski's representation that he was experiencing hardship in making payments due to the illness of his son. On May 16, 2006, Mr. Zebrowski advised Defendant that he would be late in making his payment for May, but offered to pay $1,400. Defendant accepted a partial payment of $1,400 on May 16th, placing the funds in a suspense account as permitted by the loan documents. Mr. Zebrowski failed to make his loan payment due June 1, 2006. As a result, on June 12, 2006, Defendant sent an acceleration letter to Plaintiffs' residence indicating that the loan was in default, and that Plaintiffs needed to pay $6,017.98 by July 12, 2006, to cure the default and bring the loan current.

     Two days before the deadline, on July 10, 2006, Defendant discussed potential workout options with Mr. Zebrowski in a telephone call. During this call, Mr. Zebrowski also again falsely represented that he had paid his property taxes, and claimed that he

was seeking a refund from his taxing authority.  During the same call, Mr. Zebrowski also offered to make a down payment of $5,100.00, and was prequalified for a loan modification.  Mr. Zebrowski was specifically told that the terms of the modification were not final, and dependent upon a review of the modification paperwork once it was returned.  That same day, on July 10, 2006, Defendant sent Mr. Zebrowski a letter indicating that the loan was being considered for a modification, and requested a financial statement and a copy of Mr. Zebrowski's most recent paycheck stub.  The letter expressly stated that Mr. Zebrowski had to provide the required information no later than July 20, 2006:

> Please note that until such time as you are approved for a modification, normal default servicing will continue which includes any foreclosure action that may be in process. Any fees associated with this action will continue to accrue until your loan modification is approved and will be your responsibility to pay. **You must send the documents requested above to be received in our office no later than July 20, 2006.**

A second letter requesting additional information for consideration of a possible loan modification was sent to Plaintiffs' residence on July 11, 2006.  This letter also noted that consideration of a modification would be cancelled if the requested information was not received within ten days.  Defendant also left two messages on Plaintiffs' answering machine on July 12, 2006, and July 15, 2006, but these calls were not returned.  Mr. Zebrowski never returned the modification paperwork.  As a result, on August 2, 2006, workout options were cancelled and the loan was referred for foreclosure.  A letter informing Mr. Zebrowski that the request for loan modification had been cancelled was sent that same day.

After the loan went into foreclosure, Defendant continued to pay Plaintiffs'

5

property taxes, making a payment of $1,895.49 on August 4, 2006, for taxes due third quarter 2006. This payment brought the escrow advance amount alone for Mr. Zebrowski's mortgage loan to $7,350.75.

Even after the loan went into foreclosure, Mr. Zebrowski continued to assert that the escrow account had been improperly created. On August 10, 2006, Mr. Zebrowski once again falsely advised Defendant that he had paid his taxes for October 2005 and January 2006. That same day, however, Defendant was advised by the taxing authority that no duplicate payments had been made. Mr. Zebrowski continued to claim that he had paid his taxes in calls with Defendant on August 11th, 14th, and 29th.

At the same time, Mr. Zebrowski was unable to reinstate the loan. On August 10, 2006, Defendant once again discussed workout options and sent a letter to Plaintiffs' residence requesting financial information from Mr. Zebrowski. Another letter requesting information was sent on August 11, 2006. On August 14, 2006, Mr. Zebrowski was encouraged to send back the requested information, but never did so. After the loan went into foreclosure in August 2006, Defendant refused to accept any payments that were not sufficient to reinstate the loan. Defendant also sent a letter to Plaintiffs' residence on August 14, 2006, providing them with instructions and contact information for the credit reporting agencies to initiate a dispute regarding Defendant's reporting of the foreclosure action.

Plaintiffs have argued that on August 22, 2006 they forwarded a formal correspondence to Defendant identifying Defendant's mortgage servicing errors and requesting that the Defendant advise Mr. Zebrowski as to the amount owed so he could reinstate the mortgage, cure any derogatory credit reporting, and terminate the

foreclosure proceedings.  Plaintiffs have characterized this correspondence as a Qualified Written Request ("QWR") under RESPA.

On September 8, 2006, Defendant sent a letter to Plaintiffs' residence informing them that their taxing authority had confirmed that no duplicate property tax payments had been made.  Defendant advised that the amount needed to bring payments current was $12,363.30 along with the negative escrow balance of $7,350.75.  Plaintiffs argue that the prorated escrow shortage was erroneously included in both the $12,363.30 reinstatement figure *and* the negative escrow balance of $7,350.75.  They argue that this double-charging was a violation of RESPA.  Plaintiffs also assert that "[d]uring the QWR period, Defendant negatively reported Plaintiff as delinquent" in further violation of RESPA.[2]

On October 19, 2006, Defendant received a letter from Mr. Zebrowski authorizing Mrs. Zebrowski to discuss the mortgage loan with Defendant.  That same day, Plaintiffs advised Defendant that they would search for cancelled checks evidencing their purported property tax payments.  However, no such checks were ever sent and, it turns out, none existed.  It was not until November 7, 2006, that Plaintiffs admitted in a telephone call that there were no duplicate tax payments.  Although Plaintiffs never actually contested the foreclosure action, on or about November 13, 2006, Mr.

---

[2] Defendant contends that neither Plaintiffs' Complaint nor Amended Complaint includes any allegation that they sent Defendant a QWR at any time, or that Defendant failed to adequately respond to any QWRs sent by Plaintiffs in violation of RESPA's provisions relating to a loan servicer's duties upon receipt of a QWR.  In the Statement of Material Facts Not in Dispute that Plaintiffs submitted along with their Sur-Reply, Plaintiffs deny that allegation, and "in the alternative," "move" for leave to amend the Amended Complaint, despite that discovery is closed and no Rule 15 motion was filed.

Zebrowski reinstated the loan by paying Defendant the amount required to bring the loan current.

Plaintiffs instituted this lawsuit on October 31, 2007.[3] Subsequently, in November 2008, Wells Fargo commenced a foreclosure action with respect to the mortgage at issue in the Superior Court of New Jersey, Gloucester County. In the foreclosure case, Plaintiffs did not assert any of the claims raised in this case by way of defense or counterclaim. On November 16, 2009, a final judgment was entered in favor of Wells Fargo in the foreclosure action. This Court granted Plaintiffs leave to file a Sur-Reply to address the Defendant's reply brief argument that, in light of the final judgment of foreclosure, *res judicata* barred Plaintiffs' remaining claims. Plaintiffs filed a sparse submission on April 26, 2010, but made no argument regarding the preclusive effect of the foreclosure action.

### III. Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (c). Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c).

---

[3]Plaintiffs filed an Amended Complaint in this action on February 13, 2009.

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role

is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Credibility determinations are the province of the factfinder.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## IV. Discussion

New Jersey's entire controversy doctrine, codified in Rule 4:30A of the New Jersey Rules of Civil Procedure, provides that "[n]on-joinder of claims required to be joined by the entire controversy doctrine shall result in the preclusion of omitted claims to the extent required by the entire controversy doctrine." N.J.R. 4:30A.  It is "intended to prevent fractionalized litigation by requiring the assertion of all claims arising from a single controversy in one action." Accident Fund Ins. Co. v. PML Holdings Group, LLC, 2009 WL 4724804, *6 (N.J. Super. Ct. App. Div. Dec. 11, 2009) (citing Prevratil v. Mohr, 678 A.2d 243, 248 (N.J. 1996)).  In determining whether the doctrine applies, "the central consideration is whether the claims . . . arise from related facts or the same transaction or series of transactions." DiTrilio v. Antiles, 662 A.2d 494, 502 (N.J. 1995) (citation omitted).

The entire controversy doctrine applies to "virtually all causes, claims, and defenses relating to a controversy between the parties engaged in litigation." Fields v. Thompson Printing Co., Inc., 363 F.3d 259, 265 (3d Cir. 2004) (quoting Cogdell v. Hospital Center, 560 A.2d 1169, 1173 (1989)).  Courts have explicitly held this doctrine applicable in the foreclosure context.  See In re Mullarkey, 536 F.3d at 228 (interpreting New Jersey law).  Federal courts in New Jersey have applied New Jersey's entire controversy doctrine to bar claims that were actually litigated or could have been

10

litigated in previous state court actions. See Bernardsville Quarry v. Borough of Bernardsville, 929 F.2d 927, 930 (3d Cir. 1991); Heir v. Del. River Port Auth., 218 F. Supp. 2d 627, 632 (D.N.J. 2002); Dowdell v. Univ. of Medicine and Dentistry of New Jersey, 94 F. Supp. 2d 527, 534 (D.N.J. 2000). Morever, under the Full Faith and Credit Clause of the United States Constitution, "the judicial proceedings of a state court shall have the same full faith and credit within every court in the United States as they have by law or usage in the courts of the issuing state." Paramount Aviation Corp. v. Agusta, 178 F.3d 132, 141 (3d Cir. 1999).

In New Jersey, the entire controversy doctrine is limited, in the foreclosure context, to those counterclaims deemed "germane" under New Jersey Rule 4:64-5. That rule provides that "[o]nly germane counterclaims and cross-claims may be pleaded in foreclosure actions without leave of court." N.J.R. 4:64-5. Courts have considered several types of claims germane to a New Jersey foreclosure action, including those challenging the circumstances surrounding origination of the loan, see Bank of New York v. Ukpe, 2009 WL 4895253, *7 (D.N.J. Dec.9, 2009), challenging the validity of the loan itself, see id., and challenging the amount due on the mortgage, see Associates Home Equity Svcs., Inc. v. Troup, 778 A.2d 529, 540 (N.J. Super. Ct. App. Div. 2001). Indeed, the Appellate Division has been "clear that any conduct of a mortgagee known to the mortgagor prior to the institution of a foreclosure that could be the basis of an independent action for damages by reason of the mortgagee having brought the foreclosure could be raised as an equitable defense in the foreclosure." Sun NLF Ltd. Partnership v. Sasso, 713 A.2d 538, 540 (N.J. Super. Ct. App. Div. 1998).

In this case, the claims Plaintiffs have asserted are germane and could have been

raised in the foreclosure proceeding. Plaintiffs' remaining claims are precisely the sort of claims that have been deemed germane by courts in that those claims challenge the origination and validity of the mortgage, arise out of the mortgage transaction, and dispute the amount due on the loan. See In re Mullarkey, 536 F.3d at 230 (describing the doctrine as applicable where a plaintiff alleges that the mortgagee breached the parties' underlying agreement) (discussing Leisure Technology-Northeast, Inc. v. Klingbeil Holding Co., 349 A.2d 96, 99 (N.J. Super. Ct. App. Div. 1975)). The Amended Complaint makes general claims of accounting and servicing errors and/or inaccuracies "throughout the life of the loan," with a conclusion that Defendant's actions were negligent and violated the NJCFA. Regarding RESPA, Plaintiffs' allegation is again quite vague, phrased as the "accounting and servicing obligations were performed in violation of RESPA leading to the improper assessments discussed, including, *inter alia*, the escrow, and third-party disbursements such as for taxes or insurance." These alleged improprieties occurred prior to the foreclosure proceedings, and should have been raised as defenses or counterclaims there. The entire controversy doctrine applies to Plaintiff's remaining claims; accordingly, they will be dismissed.

## V. Conclusion

For the reasons stated herein,

IT IS ORDERED this 21st day of June, 2010 that Defendant's motion for summary judgment [43] is hereby GRANTED.

   /s/ Joseph H. Rodriguez
JOSEPH H. RODRIGUEZ
United States District Judge